**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TWO HUNDRED FIFTY-SIX THOUSAND TWO HUNDRED THIRTY-FIVE DOLLARS AND NINETY-SEVEN CENTS ($256,235.97) IN PROCEEDS FROM UNIVERSAL LIFE INSURANCE POLICY #62826776 ISSUED BY NEW YORK LIFE INSURANCE and FIVE HUNDRED FIVE THOUSAND THREE HUNDRED FIFTY-SIX DOLLARS AND SIXTY-SEVEN CENTS ($505,356.67) IN PROCEEDS FROM UNIVERSAL LIFE INSURANCE POLICY #62827946 ISSUED BY NEW YORK LIFE INSURANCE,<br><br>Defendants. | No. 09-CV-1013-LRR<br><br>**ORDER** |

---

***TABLE OF CONTENTS***


***I. INTRODUCTION*** . . . . . . . . . . ***2***

***II. RELEVANT PROCEDURAL BACKGROUND*** . . . . . . . . . . ***2***
- ***A. Instant Action*** . . . . . . . . . . ***2***
- ***B. Criminal Action*** . . . . . . . . . . ***3***

***III. SUBJECT MATTER JURISDICTION*** . . . . . . . . . . ***4***

***IV. STANDARD OF REVIEW*** . . . . . . . . . . 5

***V. FACTS*** . . . . . . . . . . ***6***
- ***A. Rubashkin Family & Agriprocessors*** . . . . . . . . . . ***6***
- ***B. The Trust*** . . . . . . . . . . ***6***

*C. The Defendant Property* . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
*1. Policy 1* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
*2. Policy 2* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
*D. Bensasson* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*
*E. The 2951 Account* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
*F. Unionizing Efforts at Agriprocessors' New York Location* . . . . . . . . *9*
*G. Enforcement Action* . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*
*H. Special Agent Fischels' Conclusions* . . . . . . . . . . . . . . . . . . *9*
*I. Equity in Agriprocessors* . . . . . . . . . . . . . . . . . . . . . . . *10*

*VI. ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*
*A. Government's Failure to Comply with Local Rules* . . . . . . . . . . . . *11*
*B. Civil Asset Forfeiture Reform Act* . . . . . . . . . . . . . . . . . . . *11*
*C. Whether Harboring is a Specified Unlawful Activity* . . . . . . . . . . . *13*
*D. Whether the Defendant Property is Forfeitable* . . . . . . . . . . . . . *13*
*1. Whether proceeds include cost savings* . . . . . . . . . . . . . . . *13*
*2. Substantial connection* . . . . . . . . . . . . . . . . . . . . . . . . *17*
*3. Whether the Defendant Property facilitated a money laundering offense* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *20*
*E. Whether the Trust is an Innocent Third Party* . . . . . . . . . . . . . . *21*
*F. Deposit* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *22*

*VII. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *23*

## *I. INTRODUCTION*

The matter before the court is the Motion for Summary Judgment ("Motion") (docket no. 20), filed by Claimant Aaron Rubashkin Trust ("Trust").

## *II. RELEVANT PROCEDURAL BACKGROUND*

### *A. Instant Action*

On March 17, 2009, the government filed a Verified Complaint for Forfeiture in Rem ("Complaint") (docket no. 1). The government seeks forfeiture of: (1) $256,235.97 in proceeds from Universal Life Insurance Policy number 62826776 issued by New York Life Insurance; and (2) $505,356.67 in proceeds from Universal Life Insurance Policy number 62827946 issued by New York Life Insurance. The court refers to these insurance policies together as the "Defendant Property."

On April 13, 2009, the Trust filed a Notice of Claim (docket no. 3). On May 26, 2009, the Trust filed a Verified Answer (docket no. 8).

On October 22, 2009, the Trust filed the Motion. On December 17, 2009, the government filed a Resistance (docket no. 32). On December 21, 2009, the government filed a Supplement (docket no. 33) to the Resistance. On January 7, 2010, the Trust filed a Reply (docket no. 36).

### *B. Criminal Action*

The instant action is related to *United States v. Rubashkin*, case no. 08-CR-1324-LRR ("Criminal Action"). On July 16, 2009, a grand jury returned a 163-count Seventh Superseding Indictment (docket no. 544 in the Criminal Action) against Sholom Rubashkin. Count 1 charged Sholom Rubashkin with Conspiracy to Harbor Undocumented Aliens for Profit, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i). Counts 2 through 70 charged Sholom Rubashkin with Harboring and Aiding and Abetting the Harboring of Undocumented Aliens for Profit, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), 1324(a)(1)(A)(iv), 1324(a)(1)(A)(v)(II) and 1324(a)(1)(B)(i). Count 71 charged Sholom Rubashkin with Conspiracy to Commit Document Fraud, in violation of 18 U.S.C. § 371. Count 72 charged Sholom Rubashkin with Aiding and Abetting Document Fraud, in violation of 18 U.S.C. §§ 1546(a) and 2. Counts 73 through 86 charged Sholom Rubashkin with Bank Fraud, in violation of 18 U.S.C. § 1344. Counts 87 through 110 charged Sholom Rubashkin with False Statements and Reports to a Bank, in violation of 18 U.S.C. § 1014. Counts 111 through 124 charged Sholom Rubashkin with Wire Fraud, in violation of 18 U.S.C. § 1343. Counts 125 through 133 charged Sholom Rubashkin with Mail Fraud, in violation of 18 U.S.C. § 1341. Counts 134 through 143 charged Sholom Rubashkin with Money Laundering and Aiding and Abetting Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 2. Counts 144 through 163 charged Sholom Rubashkin with Willful Violation of an Order

of the Secretary of Agriculture and Aiding and Abetting a Willful Violation of an Order of the Secretary of Agriculture, in violation of 7 U.S.C. § 195 and 18 U.S.C. § 2.

On June 25, 2009, the court ordered separate trials on Counts 1 through 74 ("Immigration Counts") and Counts 75 through 143 ("Financial Counts").[1] From October 13, 2009 to November 12, 2009, the court held a jury trial on the Financial Counts, which the court renumbered as Counts 1 through 91. The renumbered Counts are as follows: Counts 73 through 86 became Counts 1 through 14, Counts 87 through 110 became Counts 15 through 38, Counts 111 through 124 became Counts 39 through 52, Counts 125 through 133 became Counts 53 through 61, Counts 134 through 143 became Counts 62 through 71 and Counts 144 through 163 became Counts 72 through 91.

On November 12, 2009, the jury returned verdicts of guilty on Counts 1 through 71, 73 through 80, 84 through 89 and 91 (docket no. 736 in Criminal Action). The jury returned verdicts of not guilty on Counts 72, 81, 82, 83 and 90. With respect to Counts 1-9, 15-23 and 39-47, the jury found that Sholom Rubashkin had committed the crimes of bank fraud, making false statements to a bank and wire fraud by falsely stating that Agriprocessors was in compliance with all laws when in fact it was harboring or conspiring to harbor undocumented workers.

## *III. SUBJECT MATTER JURISDICTION*

The court has original jurisdiction over the instant action. *See* 28 U.S.C. § 1345 ("Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States[.]"); 28 U.S.C. § 1355(a) ("The district courts shall have original jurisdiction [. . .] of any action or proceeding for the recovery or enforcement of any [. . .] forfeiture[.]").

---

[1] Counts 144 through 163 were charged after the court granted Sholom Rubashkin's Motion for Separate Trial. These counts were tried with the Financial Counts.

## *IV. STANDARD OF REVIEW*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[T]o establish the existence of a genuine issue of material fact, 'a plaintiff may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Rather, the nonmoving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see, e.g.*, *Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is

not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## *V. FACTS*

Viewing the facts in the light most favorable to the non-moving party, the government, the undisputed facts are:

### *A. Rubashkin Family & Agriprocessors*

Aaron Rubashkin lives in Brooklyn, New York. Aaron Rubashkin was the founder and owner of Agriprocessors, Inc. Agriprocessors was a kosher slaughterhouse in Postville, Iowa. Aaron Rubashkin also owns a butcher shop and sold products from Agriprocessors. Aaron Rubashkin is married to Rifka Rubashkin. Aaron Rubashkin has several sons, including Joseph Rubashkin, Tzvi Rubashkin and Sholom Rubashkin. Sholom Rubashkin and Tzvi Rubashkin were vice presidents of Agriprocessors. In addition to its Iowa location, Agriprocessors had locations in New York, Nebraska and Florida.

### *B. Trust*

The Trust is known interchangeably as the "Abraham Rubashkin Trust" and the "Aaron Rubashkin Trust." Trust's Statement of Material Facts (docket no. 20 at pp. 4-9), at ¶ 2. The Trust has at least three known trustees: Joseph Rubashkin, Sholom Rubashkin and Tzvi Rubashin. The Trust owns the Defendant Property.

The Trust "was established as a legitimate estate planning tool on the advice of Aaron [Rubashkin's] tax advisors." Affidavit of Joseph Rubashkin (docket no. 20 at pp. 46-54), at ¶ 17. Aaron Rubashkin was unable to obtain insurance on his own life in 2002.

Accordingly, he "arranged for an existing policy on Rifka's life to be converted into $6 million of insurance on Rifka's life in substitution for the original policy on her life." *Id.*

### *C. Defendant Property*

The Defendant Property consists of two Universal Life insurance policies issued by New York Life Insurance. Pursuant to an agreement between the government, the Trust and New York Life Insurance, the Defendant Property remains in the custody of New York Life Insurance. At the time of the Trust's creation in 2002, the cash value of the original policy on Rifka Rubashkin's life was over $300,000. The cash value of the Defendant Property is $761,592.64.

#### *1. Policy 1*

On June 26, 2002, New York Life Insurance issued policy number 62827946 ("Policy 1"). The Trust owns Policy 1. As of November 3, 2008, Policy 1 had a cash value of $505,356.67. Rifka Rubashkin is the insured. Joseph Rubashkin, as trustee of the Trust, is the beneficiary of the $3,000,000 death benefit. The monthly premium for Policy 1 is $8,333.33. The application for Policy 1 stated that its intended purpose was retirement planning. Since it originated, Policy 1 has received $633,333.10 in premium payments.

#### *2. Policy 2*

On July 8, 2002, New York Life Insurance issued Universal Life policy number 62826776 ("Policy 2"). The Trust owns Policy 2. As of November 3, 2008, the cash value on Policy 2 was $256,235.97. Rifka Rubashkin is the insured. Joseph Rubashkin, as trustee of the Trust, is the beneficiary of the $3,000,000 death benefit. The monthly premium on Policy 2 is $5,675. Since it originated, Policy 2 has received $431,000 in premium payments.

### *D. Bensasson*

Toby Bensasson worked as Agriprocessors' controller. According to Bensasson,

"at some point in the past, Sholom Rubashkin informed him that Aaron Rubashkin [. . .] was taking out a life insurance policy and that Agriprocessors [. . .] would be paying the premium on this life insurance policy." Declaration of Kerry Bolt ("Bolt Dec.") (docket no. 32-10), at 1. The premiums were paid "via a monthly ACH (debit) from account #XXX-223 of Agriprocessors, Inc. at Citizens State Bank in Postville, Iowa." *Id.* The money deposited into this account, approximately $13,000, "originated from either the sales of meat products produced by [Agriprocessors] or from money advanced by First Bank as part of Agriprocessors' line of credit." *Id.*

Bensasson stated that Sholom Rubashkin "became upset with the fact that the life insurance policy premium was being paid directly" from the Citizens State Bank account. Sholom Rubashkin was upset because these withdrawals "made it more difficult for [him] to know how much money he would need" in that account on a daily basis. *Id.* at 2. Accordingly, Sholom Rubashkin asked Bensasson to stop the automatic payments.

Later, Aaron Rubashkin contacted Bensasson and asked him why Agriprocessors had stopped paying the premiums on the Defendant Property. Bensasson suggested that Aaron Rubashkin speak to Sholom Rubashkin about this issue.

After this conversation, someone directed Bensasson to open a new account at Citizens State Bank in the name of "Rubashkin Insurance Trust." *Id.* The purpose of the new account "was to pay the monthly premium payment on the life insurance policy." *Id.* The premium amount increased to slightly more than $14,000 each month. The ultimate source of these funds was Agriprocessors.

### *E. The 2951 Account*

On the fifth day of each month, an account at Citizens State Bank paid the monthly premiums on the Defendant Property from an account number ending in 2951 (the "2951 Account"). The 2951 Account is in the name of "Abraham Rubashkin Insurance Trust." Affidavit of Special Agent Michael Fischels ("Fischels Aff.") (docket no. 1-2), at ¶ 40.

On June 12, 2002, the 2951 Account was opened.[2] Sholom Rubashkin, Tzvi Rubashkin and Joseph Rubashkin are signatories on the 2951 Account.

Each month, approximately $14,000 is deposited into the 2951 Account. Agriprocessors was the source of these deposits. Many deposits into the 2951 Account "are in the form of checks written on one of the Agriprocessors bank accounts, payable to A.A. Rubashkin and Sons, Inc." *Id.* at ¶ 39. These deposit checks "are stamped on the back with no written endorsements found[.]" *Id.* The 2951 Account is debited by $14,008.33 each month. This amount is the combined total of monthly premiums for the Defendant Property.

### *F. Unionizing Efforts at Agriprocessors' New York Location*

In September of 2005, approximately 15 employees from Agriprocessors' New York location voted to join the United Food and Commercial Workers Union ("Union"). After the election, Agriprocessors asserted that the majority of the employees at its New York location provided false documents to Agriprocessors for employment purposes. More specifically, Agriprocessors argued that these employees submitted social security cards and resident alien cards to Agriprocessors that were either invalid or, according to the Social Security Administration ("SSA"), did not match the employee's name. Agriprocessors argued that these employees could not legally work in the United States.

### *G. Enforcement Action*

In May of 2008, the United States Immigration and Customs Enforcement ("ICE") conducted a workplace enforcement action at Agriprocessors' location in Postville, Iowa. During the enforcement action, several hundred Agriprocessors employees were arrested for immigration-related crimes, charged and convicted.

### *H. Special Agent Fischels' Conclusions*

S/A Fischels states that, based on his review of documents from the SSA and other

---

[2] The parties do not indicate who opened the 2951 Account.

government agencies, Agriprocessors employed approximately 737 undocumented workers at its facility in Postville, Iowa. S/A Fischels estimated Agriprocessors' total employment at its Postville facility was approximately 800 employees. Based on his investigation, S/A Fischels concluded that Agriprocessors had profited from its harboring of undocumented workers. S/A Fischels also concluded, based on his investigation, that the money Agriprocessors deposited into the 2951 Account was derived from Agriprocessors' harboring of undocumented workers.

### *I. Equity in Agriprocessors*

Joseph Rubashkin states that, whether or not Agriprocessors employed undocumented workers, from 2002 through 2008, its equity and cash was "more than sufficient to fund" the Defendant Property's proceeds and premiums. Affidavit of Joseph Rubashkin at ¶ 19. At the time the Trust purchased the Defendant Property in 2002, Aaron Rubashkin's equity in Agriprocessors was valued at approximately $5,000,000. If Agriprocessors had been liquidated in 2002, it would not have needed any proceeds derived from Agriprocessors' employment of undocumented workers to fund the Defendant Property.

In 2004, Aaron Rubashkin's equity interest in Agriprocessors was nearly $10,000,000. Abraham Roth, an accountant, states that, for the fiscal year ending in June of 2004, Agriprocessors had equity "far in excess" of the premiums paid for the Defendant Property "from 2002 through the present." Affidavit of Abraham Roth ("Roth Aff.") (docket no. 20, pp. 57-59), at ¶ 5. Consequently, Roth concludes that Agriprocessors' payments for the Defendant Property constituted a return of capital—not proceeds from any illegal activities. Roth claims that, if undocumented workers constituted forty percent of Agriprocessors' work force from June 30, 2004 through June 30, 2007, and if labor costs were increased by thirty percent, Agriprocessors would have generated more than enough income to pay the premiums on the Defendant Property each year with legitimate

funds.

In the fiscal year ending in June of 2008, that is, the same year of the enforcement action, Agriprocessors sustained an operating loss of $5,699,000. Roth states that, in his opinion, the fact that Agriprocessors sustained a nearly $6 million loss shows that Agriprocessors "clearly did not profit from any alleged [Agriprocessors] activities, legal or otherwise." *Id.* at ¶ 4.

## *VI. ANALYSIS*

### *A. Government's Failure to Comply with Local Rules*

The government failed to comply with the Local Rules. Specifically, Local Rule 56.b.2 requires that a party resisting a motion for summary judgment must file, in addition to a brief, "[a] response to the statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact[.]" LR 56.b.2. "The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact[,] constitutes an admission of that fact." LR 56.b. Because the government failed to respond to the Trust's Statements of Material Facts, all of the Trust's Statement of Material Facts are deemed admitted. However, to the extent the Trust's Statement of Material Facts contains legal conclusions, the court does not adopt them. *See Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004) (stating that the court may only consider "admissible evidence" and must "disregard portions of [. . .] affidavits and depositions that [. . .] purport[] to state legal conclusions as fact.").

### *B. Civil Asset Forfeiture Reform Act*

"A civil forfeiture action is an *in rem* proceeding brought by the government as plaintiff against defendant property asserting that '[a]ll right, title, and interest in [the defendant] property' has vested in 'the United States upon commission of the act giving rise to forfeiture.'" *United States v. Dodge Caravan Grand SE/Sport Van, VIN #*

*1B4GP44G2YB7884560*, 387 F.3d 758, 760 (8th Cir. 2004) (quoting 18 U.S.C. § 981(f)). Civil forfeiture is governed by the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub. L. No. 106-185, 114 Stat. 202, codified in part at 18 U.S.C. §§ 981 & 983. CAFRA "applies to forfeiture actions initiated after August 23, 2000." *United States v. Triplett*, 240 F. App'x 736, 736 (8th Cir. 2007). "Under CAFRA, the burden of proof is on the [g]overnment to establish, by a preponderance of the evidence, that the property is subject to forfeiture." *United States v. Real Prop. Located at 3234 Wash. Ave. N., Minneapolis, Minn.*, 480 F.3d 841, 843 (8th Cir. 2007) (citing 18 U.S.C. § 983(c)(1)) (internal quotation marks omitted). "[I]f the [g]overnment's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the [g]overnment shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

The government seeks forfeiture of the Defendant Property pursuant to 18 U.S.C. § 981(a)(1)(A). Section 981(a)(1)(A) provides: "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property," is subject to forfeiture to the United States. 18 U.S.C. § 981(a)(1)(A). The government alleges that the Defendant Property was involved in a violation of 18 U.S.C. § 1957, which is "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity[.]" 18 U.S.C. § 1957(a). The specified unlawful activity alleged in the Complaint is harboring illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). Stated another way, the government alleges that forfeiture of the Defendant Property is appropriate because Agriprocessors' payments to the Trust were made in conjunction with its harboring of undocumented workers.

### *C. Whether Harboring is a Specified Unlawful Activity*

The Trust argues that the court should grant the Motion because harboring undocumented workers is not a specified unlawful activity as defined in 18 U.S.C. § 1957. "Specified unlawful activity" is defined in § 1956. 18 U.S.C. § 1957(f)(3). "Specified unlawful activity" includes offenses listed in 18 U.S.C. § 1961(1). 18 U.S.C. § 1956(c)(7)(A). Section 1961(1) includes "harboring certain aliens." 18 U.S.C. § 1961(1). In its Reply, the Trust concedes that harboring is a specified unlawful activity. Accordingly, the court shall deny the Motion to the extent it asks the court to dismiss the Complaint because harboring undocumented workers is not a specified unlawful activity.

### *D. Whether the Defendant Property is Forfeitable*

The Trust argues that the court should grant the Motion because the Defendant Property is not subject to forfeiture. The Trust claims that the Defendant Property is not subject to forfeiture because: (1) the Defendant Property is not the proceeds of a crime; (2) the Defendant Property does not have a substantial connection or nexus with any unlawful activity; (3) the Defendant Property did not facilitate a money laundering offense; and (4) the Defendant Property is not "traceable" to a specified unlawful activity. Brief in Support of Motion (docket no. 20, pp. 10-33), at 22. The court examines each of these arguments, in turn.

#### *1. Whether proceeds include cost savings*

First, the Trust argues that the government cannot prove the Defendant Property is the proceeds of a criminal activity. The Trust focuses on the meaning of "proceeds," and argues that, at best, Agriprocessors' harboring of undocumented workers provided "cost savings." *Id.* The Trust argues that cost savings are not "proceeds" under 18 U.S.C. § 1956. In support of its argument, the Trust quotes *United States v. Maali*, 358 F. Supp. 2d 1154 (M.D. Fla. 2005) at length. *Maali* interpreted the meaning of "proceeds" in § 1956 and considered whether "proceeds" included net profits, gross receipts or gross

profits. 358 F. Supp. 2d at 1158. *Maali* held that "proceeds" does not "contemplate profits or revenue indirectly derived from labor or from the failure to remit taxes" and therefore does not include cost savings. *Id.* As a preliminary matter, the court notes that it is not bound by the decisions of other district courts. The court also notes that *Maali* is effectively mooted by the Supreme Court's decision in *United States v. Santos*, 128 S. Ct. 2020 (2008), which discussed the meaning of proceeds in § 1956. In any event, the court declines to engage in a legal analysis of whether "proceeds" means "profits" because there is a genuine issue of material fact as to whether Agriprocessors profited from its harboring of undocumented workers.

In his Affidavit, S/A Fischels states that Agriprocessors is the source of the $14,000 monthly deposits into the 2951 Account. S/A Fischels states that Agriprocessors deposited payments into the 2951 Account that were involved in Agriprocessors' harboring of undocumented workers. It is unclear whether Agriprocessors "profited" from its harboring activities or whether it merely enjoyed cost savings in the form of reduced labor costs and taxes. Either way, the Trust does not put forth any evidence that shows it *did not* profit from harboring undocumented workers. Instead, the Trust cites a report prepared by Abraham Roth that contains a number of unsupported, conclusory statements about Agriprocessors' finances. All of Roth's points are unavailing because they are entirely speculative. Nevertheless, the court analyzes each of Roth's findings below.

First, Roth observes that, for the fiscal year ending in June of 2008, Agriprocessors' operating loss was $5,699,000. Roth states, without explanation, that "[i]t is [his] opinion that a company with such a loss clearly did not profit from any [. . .] activities, legal or otherwise." Roth Aff. at ¶ 4. While this argument may be true for the fiscal year ending in 2008, it overlooks that Agriprocessors harbored undocumented workers prior to that year. Agriprocessors had a practice of harboring undocumented workers as early as September of 2005, when it tried to thwart a union organization by

claiming that its employees were not authorized to work in the United States.

Second, Roth observes that, for the fiscal year ending in June of 2004, Agriprocessors had equity that exceeded $1,065,000. From that fact, Roth leaps to the conclusion that the payments Agriprocessors made to the Defendant Property "constituted return of capital; not proceeds from any [Agriprocessors] activities, legal or otherwise." *Id.* at ¶ 5. The court declines to consider Roth's conclusion. It is unsupported and requires the court to find that, simply because Agriprocessors had legitimate equity sufficient to fund the Defendant Property, it chose to fund the Defendant Property with that equity rather than from any other source. Moreover, Bensasson contradicts this assertion by stating that Agriprocessors' deposits into the 2951 Account were derived in part from Agriprocessors' meat sales.

Third, Roth engages in a "wage differential" analysis. *Id.* at ¶¶ 7-10. Roth assumes that at least forty percent of Agriprocessors' work force was comprised of undocumented workers. Then, Roth assumes that, if forty percent of Agriprocessors' labor costs were increased by thirty percent as a wage differential, Agriprocessors would have generated sufficient legitimate income to pay the premiums on the Defendant Property. Roth also states that, in his opinion, wage differentials are not proceeds, but cost savings. Roth's assumptions are not supported by any facts in the record. The amount of labor costs associated with legal and illegal employees is unclear. Therefore, the court shall not take Roth's unsupported assumptions as evidence of anything.

Finally, Roth states that, based on his "review" of "Financial Statements for years ending June 30, 2004 through June 27, 2008," in addition to "his knowledge and experience with respect to the matters addressed" by his affidavit, he believes that the premium payments "were not generated by any illegal gains" and that Agriprocessors "had capital and stockholder loans far in excess of the total [p]remium payments[.]" *Id.* at ¶¶ 9 & 10. Roth also states that none of the premium payments were "concealed, illegally

sourced, or illegally applied or disguised or used to evade the payment of taxes or avoid prosecution." *Id.* at ¶ 11. These statements merely reiterate Roth's prior "findings." They are inconsistent with Bensasson's statements. For the reasons stated above, the court declines to consider Roth's unsupported conclusions.

In conclusion, the court finds that the Trust failed to set forth any evidence showing that Agriprocessors did not profit from its harboring activities. Accordingly, the court declines to dismiss the instant action based on the Trust's argument that the proceeds of Agriprocessors' harboring of undocumented workers is merely cost savings. However, the court advises the parties that the issue of whether proceeds includes cost savings may become relevant at trial.[3]

---

[3] It appears likely that the proceeds from Agriprocessors' harboring of undocumented workers can include more than profits. In *Santos*, a plurality of the Supreme Court held that the term "proceeds" in 18 U.S.C. § 1956 (the statute criminalizing money laundering) always means profits derived from the illegal activity and not simply the gross receipts derived from the activity. *Santos*, 128 S.Ct. 2020 at 2025. Justice Stevens concurred in the judgment, but "rejected the always-the-one or always-the-other approaches offered by his colleagues." *United States v. Kratt*, 579 F.3d 558, 561 (6th Cir. 2009). According to Justice Stevens, the question of whether the government must prove that a defendant derived profits from the unlawful activity depends on the underlying predicate offense. *Id.*

The predicate offense in *Santos* was operating an illegal gambling business. *Santos*, 128 S.Ct. at 2032-33. In deciding whether that predicate offense required the government to prove profits, Justice Stevens considered what he called a "merger problem." *Id.* Justice Stevens agreed with the plurality that the government must prove profits when the underlying offense is operating an illegal gambling business: "Allowing the [g]overnment to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business." *Id.* at 2033.

"Because *Santos* was a plurality opinion, its precedent is the narrowest holding that garnered five votes." *United States v. Spencer*, 592 F.3d 866, 879 n.4 (8th Cir. 2010). Therefore, the court engages in Justice Stevens's analysis as applied to the predicate

(continued…)

### 2. *Substantial Connection*

The Trust argues that the government "has failed to allege any substantial connection or nexus whatsoever between the Defendant Property and the alleged violations of law or that the Defendant Property would not have existed 'but for' the alleged violations of law." Trust Br. (docket no. 20, pp. 10-33), at 27. The government argues that it does not need to show that the Defendant Property has a substantial connection to the money laundering violation. The government argues that, because the Defendant Property "is the subject of the money laundering, no additional proof is required." Gov. Br. at 18. The government complains that the Trust "simply wants the United States to prove an additional nebulous fact not required by the statute or case law." *Id.* at 18. However, under a plain-language reading of the relevant statute, the government must prove that a substantial connection exists.

The statute that sets forth the general rules for civil forfeiture proceedings, 18 U.S.C. § 983, prescribes the government's burden of proof. Section 983(c)(3) provides: "if the [g]overnment's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, *or was involved in the commission of a*

---

[3](...continued)
offense of harboring undocument workers for commercial advantage and private financial gain. The "merger problem" that concerned Justice Stevens is not present in this case. Justice Stevens concluded that, "[a]llowing the [g]overnment to treat the mere payment of the *expense* of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy[.]" *Santos*, 128 S. Ct. at 2033 (emphasis added). To be sure, Agriprocessors' harboring scheme caused it to incur expenses associated with its labor force, such as wages. However, because it employed undocumented workers, Agriprocessors enjoyed tremendous financial benefits. For example, Agriprocessors could have paid its illegal work force lower wages and paid fewer payroll and social security taxes. In light of the facts and circumstances surrounding the instant action, the court is likely to conclude that, in this case, "proceeds" includes cost-saving measures that allowed Agriprocessors to enjoy a commercial advantage over its competitors that employed a legal work force.

*criminal offense*, the [g]overnment shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 981(c)(3) (emphasis added).[4] The Complaint states that the instant action is a civil action "in rem brought to enforce the provision of 18 U.S.C. § 981(a)(1)(A) as property involved in money laundering[.]" Complaint at ¶ 1 (emphasis in original). The Eighth Circuit Court of Appeals held that the government must show a substantial connection between the defendant property and the underlying offense. *See Dodge Caravan*, 387 F.3d at 761 ("CAFRA requires the government to establish that there was a substantial connection between the property [to be forfeited] and the offense.").

The government cites a number of cases in support of its position. All are unavailing. For instance, the government cites *United States v. Seher*, 562 F.3d 1344 (11th Cir. 2009), *United States v. Nektalov*, 461 F.3d 309 (2d Cir. 2006) and *United States v. Kennedy*, 201 F.3d 1324 (11th Cir. 2000). All of these cases involve the *criminal* forfeiture provision in § 982—not the *civil* forfeiture provision in §§ 981 and 983. *Seher*, 562 F.3d at 1368; *Nektalov*; 461 F.3d at 319; *Kennedy*, 201 F.3d at 1325. Unlike the civil forfeiture provisions, § 982 does not contain a "substantial connection" or "nexus" requirement. 18 U.S.C. § 982. The remainder of the cases the government cites applied the forfeiture provisions that were in place prior to CAFRA's enactment. *See* Gov. Br. at 19 (citing *United States v. Hawkey*, 148 F.3d 920 (8th Cir. 1998), *United States v. Real Prop. Known as 1700 Duncanville Road*, 90 F. Supp. 2d 737 (N.D. Tex. 2000) and *United States v. One 1987 Mercedes Benz 300E, VIN: WDBEA30D6HA4001100 VA Tag: MVI 688*, 820 F. Supp. 248 (E.D. Va. 1993)).[5] Accordingly, the court concludes that the

---

[4] On May 7, 2009, Congress amended § 983. Statutory Time-Periods Technical Amendments Act of 2009, Pub. L. No. 111-16, 123 Stat. 1607. Both the prior and current versions of § 983 require a substantial connection.

[5] Additionally, *Hawkey* was a criminal forfeiture proceeding. *Hawkey*, 148 F.3d
(continued...)

government must show a substantial connection between the Defendant Property and the offense.

In any event, the court finds that there is a disputed issue of material fact over whether the Defendant Property has a substantial connection to Agriprocessors' illegal activity. Roth states that the Defendant Property was not funded by any proceeds from any of Agriprocessors' illegal activity. Even if the court assumed Roth's unsupported conclusions were true, the government has set forth conflicting evidence that the Defendant Property is comprised of proceeds from the harboring of undocumented aliens. More specifically, the government has set forth evidence that shows: (1) a large portion of Agriprocessors' work force was comprised of undocumented workers; (2) Agriprocessors used its illegal work force to slaughter and pack beef and poultry products that it sold; (3) on a monthly basis, Agriprocessors deposited approximately $13,000-$14,000 of the payments it received from its customers into its Citizens State Bank account and the 2591 Account; (4) these funds originated from Agriprocessors' sale of meat products and from its advances on a line of credit from First Bank Business Capital, Inc.; and (5) the Citizens State Bank account and the 2951 Account were debited by approximately $14,000 each month to pay the premiums on the Defendant Property.[6] In light of those circumstances,

---

[5](...continued) at 927.

[6] The court notes that the information in the Bolt Declaration that Bolt attributes to Bensasson is hearsay. Bensasson made these statements to Special Agent Van Gent, which S/A Van Gent included in a report, which Bolt read and summarized in the Bolt Declaration. *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); Fed. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules[.]"). However, when making a probable cause determination in a civil forfeiture case, the court may consider hearsay evidence. *See United States v. 3402 53rd St. W. Bradenton, Fla.*, 178 F. App'x 946, 947 (11th Cir. 2006) (stating that "the (continued...)

it is clear that there is a genuine issue of material fact as to whether the Defendant Property has a substantial connection with the money laundering and harboring offense. Accordingly, the court shall deny the Motion to the extent it asks the court to grant summary judgment due to an absence of a substantial connection.

***3. Whether the Defendant Property facilitated a money laundering offense***

The Trust argues that the government cannot prove that the Defendant Property facilitated a money laundering offense. "The term 'facilitate' encompasses 'activity making the prohibited conduct less difficult or more or less free from obstruction or hindrance.'" *3234 Wash. Ave.*, 480 F.3d at 843 (quoting *United States v. Premises Known as 3639—2nd St. N.E., Minneapolis, Minn.*, 869 F.2d 1093, 1096 (8th Cir. 1989)).

In support of its argument, the Trust cites *United States v. Aversa*, 984 F.2d 493 (1st Cir. 1993). The Trust argues that, under the definition of money laundering in *Aversa*, there is no evidence that the Defendant Property was the subject of any money laundering. *Aversa* stated, in relevant part:

> The President's Commission on Organized Crime has defined money laundering as the "process by which one conceals the existence, illegal source, or illegal application of income, and

[6](…continued)
government may use both circumstantial evidence and hearsay" in a civil forfeiture case); *United States v. One Parcel of Real Estate Located at 7715 Betsy Bruce Lane, Summerfield, N.C.*, 906 F.2d 110, 113 (4th Cir. 1990) (stating same); *Ted's Motors, Inc. v. United States*, 217 F.2d 777, 780 (8th Cir. 1954) ("[I]nformation of guilt, even though hearsay and incompetent with respect to the merits of a case [. . .], may constitute probable cause or, in other words, a reasonable ground for a belief of guilt[.]"); *United States v. $11,511.00 in United States Currency*, No. 06-3370-CV-S-ODS, 2009 WL 961776, *1 (W.D. Mo. Apr. 8, 2009) ("The [g]overnment is permitted to use both circumstantial evidence and hearsay to show the substantial connection between the property and the offense."); *see also United States v. $159,880.00 in United States Currency, More or Less*, 387 F. Supp. 2d 1000, 1012 (S.D. Iowa 2005) (Gritzner, J.) ("Plaintiff can use circumstantial evidence to show that the defendant money is substantially connected to the asserted drug-related crime.").

> then disguises that income to make it appear legitimate." In other words, laundering involves the hiding of the paper trail that connects income or money with a person in order for such person to evade the payment of taxes, avoid prosecution, or obviate any forfeiture of his illegal drug income or assets[.]

*Aversa*, 984 F.2d at 504 (quoting H.R. Rep. No. 746, at 16 (1986) (emphases omitted)).

The court finds that *Aversa* does not provide a basis for the court to dismiss the government's claim. First, the court notes that the Supreme Court vacated *Aversa* on January 18, 1994. *Donovan v. United States*, 510 U.S. 1069 (1994). Second, the court finds that the government set forth a prima facie case for forfeiture under the definition of money laundering in *Aversa*. Agriprocessors deposited funds it derived from its harboring activities into the 2951 Account and at an account at Citizens State Bank. All of the funds deposited into the 2951 Account, and at least some of the funds deposited in the Citizens State Bank account, were used to pay the premiums on the Defendant Property. By paying the premiums on the Defendant Property, it is possible to conclude that Agriprocessors was trying to "conceal the existence, illegal source, or illegal application of income [. . .] and disguise[] that income to make it appear legitimate." *Aversa*, 984 F.2d at 504. The fact that the Defendant Property hinged on Rifka Rubashkin's life is irrelevant, because one of the ultimate beneficiaries of the Defendant Property is Sholom Rubashkin, who allegedly presided over the harboring activities at Agriprocessors. The government presented evidence showing that Sholom Rubashkin was heavily involved in the illegal activities at Agriprocessors.

The court finds that the government asserted facts establishing that the Defendant Property facilitated money laundering. Accordingly, the court shall deny the Motion to the extent it asks the court to dismiss the Complaint on this basis.

### *E. Whether the Trust is an Innocent Third Party*

The Trust argues that forfeiture is inappropriate because it is an innocent third party. Section 983(d) provides that "[a]n innocent owner's interest in property shall not

be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence." 18 U.S.C. § 983(d)(1). An "innocent owner" is an owner who either "did not know of the conduct giving rise to forfeiture" or "upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." *Id.* at § 983(d)(2)(A). Because the Trust is an institution and not one or more individuals, "agency principles [. . .] govern determination of the innocent owner defense." *3234 Wash. Ave.*, 480 F.3d at 846. "CAFRA should be construed in a manner that protects such institutions from unwarranted or disproportionate forfeitures." *Id.*

The Trust argues that it is innocent of any wrongdoing. It asserts that it was established before any immigration offenses took place and does not consist of the proceeds of any unlawful activity. The Trust provides no evidence in support of this position. As previously stated, the government presented evidence that shows that the Defendant Property is comprised, in part, of proceeds from Agriprocessors' harboring of undocumented workers. Agriprocessors paid premiums on the Defendant Property through the 2951 Account well after Agriprocessors knew that it was harboring undocumented workers. Accordingly, the court shall deny the Motion to the extent it asks the court to dismiss the Complaint under the innocent owner defense. *See United States v. Seven Firearms & Ammunition*, 116 F. App'x 51, 52 (8th Cir. 2004) (declining to apply innocent owner defense). However, the court does find that the Trust may assert the innocent owner defense at trial.

***F. Deposit***

The Trust argues that $300,000 of the Trust Property is not forfeitable because it was the value of "the original policy on Rifka's life[.]" Trust Br. at 17. Aaron Rubashkin converted Rifka's policy into the Defendant Property. The Trust provides no authority for

the court to exclude the deposit from forfeiture. In the absence of any authority to exclude this amount from forfeiture, the court declines to grant this portion of the Motion at this time. However, the Trust is not precluded from seeking to exempt this portion of the Defendant Property from forfeiture at trial.

## *VII. CONCLUSION*

In light of the foregoing, the Motion (docket no. 20) is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 8th day of March, 2010.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA